AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| David Brock Lovelace and Dale B. DuBois | ) ) ) ) ) | Case No. 8:14MJ1793TBM |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  July 2014 through November 2014  in the county of  Hillsborough  in the  Middle  District of  Florida , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. sec. 371 | The defendants did knowingly and willfully combine, conspire, confederate and agree with each other and with other persons to commit offenses against the United States, that is to defraud the United States and violate Title 42, United States Code, Section 1320a-7b(b). |

This criminal complaint is based on these facts:

Please see attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Isaac Bledsoe, Special Agent, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11-10-14

_____
*Judge's signature*

City and state:  Tampa, Florida

Thomas B. McCoun III
*Printed name and title*

## AFFIDAVIT OF SPECIAL AGENT ISAAC BLEDSOE
## IN SUPPORT OF CRIMINAL COMPLAINT

Your affiant, ISAAC BLEDSOE, hereby swears and affirms as follows:

### A.   Identity and Experience of the Affiant

1.   I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"). I have been an HHS-OIG agent since October 2010, and I am presently assigned to the Tampa Field Office. My duties and responsibilities include the enforcement and administration of all laws, regulations, orders, contracts, and programs in which the United States Department of Health and Human Services is or may be a party in interest, as authorized by the Inspector General Act of 1978.

2.   I have received extensive training in investigations of fraud related to the United States health care system. In addition, I have four years of prior law enforcement experience as a Special Agent with the United States Air Force, Office of Special Investigations.

3.   This Affidavit is in support of a criminal complaint charging DAVID BROCK LOVELACE ("Lovelace") and DALE DUBOIS ("DuBois") with Conspiracy to Defraud the United States and Pay Kickbacks in violation of Title 18, United States Code, Section 371. The statements in this Affidavit are based upon information I learned during the investigation, including, but not limited to information provided by other law enforcement personnel, cooperating witnesses, public sources, business records, bank records, and my experience and background as an HHS-OIG Special Agent. This Affidavit does not

1


contain all the facts of this investigation that I am aware of, but only those necessary to establish probable cause.

### B. The Medicare Program

4. The Medicare Program ("Medicare") is a federal "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that provides medical benefits, items and services (collectively "services") to persons age 65 or older or with certain disabilities (hereinafter "beneficiaries").

5. Part B of the Medicare Program is a medical insurance program that covered, among other things, certain physician and outpatient services, and other health care benefits, items and services, including certain medically necessary blood tests, urinalysis, genotyping, and tests on tissue specimens (together "clinical diagnostic laboratory services"), that are medically necessary and ordered by a licensed medical doctor or other licensed qualified health care provider.

6. In Florida, Medicare Part B's insurance concerning clinical diagnostic laboratory services, and related health care benefits, items, and services are administered by First Coast Service Options, Inc. (hereinafter "First Coast"), pursuant to a contract with the United States Department of Health and Human Services. Among First Coast's responsibilities, it receives, adjudicates, and pays the claims of authorized providers seeking reimbursement for the cost of clinical diagnostic laboratory services, and other health care benefits, items, or services supplied or provided to Medicare beneficiaries.

### C. Medicare Billing Procedures

7. A provider that seeks to participate in Medicare Part B and bill Medicare for the cost of clinical diagnostic laboratory services, and related benefits, items, and services is required to apply for and receive a provider number. The provider number allows a provider to submit bills, known as "claims," to Medicare to obtain reimbursement for the cost of clinical diagnostic laboratory services, and related health care benefits, items, and services that a provider had rendered to beneficiaries.

8. To receive payment from Medicare, a provider, using its provider number, submits a health insurance claim form, known as a CMS-1500. Medicare permits providers, or a designated third-party biller, to submit a CMS-1500 electronically or by way of a paper claim form. The CMS-1500 requires providers to provide certain important information, including: (a) the Medicare beneficiary's name and identification number; (b) the identification number of the doctor or other qualified health care provider who ordered the health care benefit, item, or service that was the subject of the claim; (c) the health care benefit, item, or service that was provided or supplied to the beneficiary; (d) the billing codes for the benefit, item, or service; and (e) the date upon which the benefit, item, or service was provided or supplied to the beneficiary.

9. Medicare, through First Coast, generally pays a substantial portion of the cost of the clinical diagnostic laboratory services, or related health care benefits, items, and services that were medically necessary and ordered by licensed doctors or other licensed, qualified health care providers.

10. Payments under Medicare Part B are often made directly to the provider rather than to the patient/beneficiary. For this to occur, the beneficiary assigns the right

of payment to the health care provider. Once such an assignment takes place, the provider assumes the responsibility for submitting claims to, and receiving payments from, Medicare.

11. If the provider's Medicare claim is approved, a substantial portion of the total amount of the claim is paid either by check or by wire transfer to an account designated by the provider.

12. Under Medicare rules and regulations, clinical diagnostic laboratory services, or related health care benefits, items, or other services must be medically necessary and ordered by a licensed doctor or other licensed, qualified health care provider in order to be reimbursed by Medicare.

D. **United States v. Lovelace, et al., 8:14-CR-00164-SDM-EAJ**

13. Your affiant led a previous investigation into Lovelace and co-conspirators for committing various federal criminal offenses relating to health care fraud. In fact, on May 13, 2014, Lovelace and co-conspirators were arrested pursuant to an Indictment returned in the Middle District of Florida that charged him with violations of Title 18, United States Code, Section 1347, Health Care Fraud; Title 18, United States Code, Section 1349, Conspiracy to Commit Health Care Fraud; Title 18, United States Code, Section 1956(a)(1)(B)(i), Money Laundering; Title 18, United States Code, Section 1957, Money Laundering; and Title 18, United States Code, Section 1956(h), Conspiracy to Commit Money Laundering. A copy of the Indictment is attached hereto as Exhibit A and is incorporated herein by reference.

14. The Indictment charges a total of 46 counts and five defendants, including Lovelace. The Indictment alleges that co-conspirators, including Lovelace, used

multiple health care clinics and shell companies to cause the submission of over $12 million in false and fraudulent reimbursement claims to Medicare. Medicare paid over $2.8 million in reimbursement on those claims. Two of the five defendants have already pleaded guilty in the case, which is presently scheduled for trial in April 2015. Both of these defendants, who are co-conspirators with Lovelace, have admitted that the fraud scheme in which they engaged with Lovelace included the submission of Medicare reimbursement claims resulting from unlawful and illegal kickback arrangements, including the payment of cash to clinic owners in exchange for providing patients.

15. Allegations set forth in the Indictment include Lovelace's use of Cornerstone Health Specialists, Summit Health Specialists, P.L., and Coastal Health Specialists to cause the submission of reimbursement claims to Medicare for services purportedly rendered to Medicare beneficiaries who had died prior to the supposed date of service. Specifically, the table below identifies the individual counts in the attached Indictment that are based on claims for reimbursement for services purportedly provided to deceased Medicare beneficiaries.

| Count | Clinic | Beneficiary | Date of Death | Purported Date of Service |
|---|---|---|---|---|
| 2 | Cornerstone Health | M.B. | Oct. 19, 2007 | Apr. 4, 2011 |
| 3 | Cornerstone Health | M.B. | Oct. 19, 2007 | Apr. 5, 2011 |
| 4 | Cornerstone Health | M.B. | Oct. 19, 2007 | Apr. 5, 2011 |
| 5 | Cornerstone Health | A.W. | Jul. 1, 1996 | Mar. 27, 2012 |
| 6 | Cornerstone Health | A.W. | Jul. 1, 1996 | Mar. 27, 2012 |
| 9 | Cornerstone Health | R.A. | Mar. 31, 1989 | Sep. 6, 2012 |
| 13 | Summit Health | R.H. | Sep. 17, 2009 | Nov. 28, 2012 |
| 19 | Summit Health | M.C. | Sep. 19, 2005 | Mar. 14, 2013 |
| 26 | Coastal Health | R.V. | Jul. 9, 2013 | Oct. 4, 2013 |
| 27 | Coastal Health | R.E. | Mar. 4, 2013 | Oct. 17, 2013 |
| 28 | Coastal Health | A.G. | Jul. 2, 2013 | Oct. 17, 2013 |
| 29 | Coastal Health | A.G. | Jul. 2, 2013 | Oct. 17, 2013 |
| 30 | Coastal Health | T.P. | Feb. 12, 2013 | Oct. 21, 2013 |
| 31 | Coastal Health | H.M. | Aug. 18, 1995 | Jan. 15, 2014 |

Both of the defendants who have pleaded guilty in U.S. v. Lovelace, et al., admitted that the fraud scheme in which they engaged with Lovelace included the submission of Medicare reimbursement claims seeking payment for services purportedly provided to deceased Medicare beneficiaries.

16. Contemporaneous with Lovelace's arrest in U.S. v. Lovelace et al., Lovelace's 2010 BMW 535i four-door sedan was seized pursuant to a seizure warrant, because probable case had been established demonstrating that Lovelace used proceeds from his fraud scheme to purchase the vehicle. Subsequently, it was determined that Lovelace had insufficient equity in his BMW to justify the government paying to keep it in storage during the pendency of the case. As a result, it was released to him pursuant to a limited release agreement. As set forth below, there is evidence that Lovelace is using his BMW in the commission of a crime.

17. Lovelace was released on bond following his arrest. The Amended Order of Release (DE 45) includes prohibitions on committing crimes and working in any occupation relating to the health care industry, as follows: "The defendant shall not commit a federal, state or local crime during the period of his release[,]" and the "defendant shall not engage in any occupation relating to the health care or financial services industries during the pendency of this case."

E. **The Laboratory Testing Kickback Scheme**

18. A subsequent investigation has established probable cause to believe that Lovelace is engaged in a cash-for-patients kickback scheme involving clinical laboratory testing, and that the cash-for-patients kickback scheme is and has been ongoing, even

after Lovelace's release on bond in his pending federal criminal case. Specifically, Lovelace, DuBois, and Cooperating Witness 1 ("CW1") have been paying cash kickbacks to certain purported medical clinics in Miami-Dade County, Florida for at least the last two months in return for completed DNA test samples (e.g., swabs of saliva) and patient information for the completed DNA test samples.

19. Prior to Lovelace's arrest in his pending federal criminal case, Lovelace had been procuring biological test samples from Medicare beneficiaries that he would submit to one or more laboratories for analysis, and the laboratories would submit reimbursement claims to Medicare seeking payment for the testing work performed on the samples Lovelace provided. For example, Affiliated Genetics, Inc. is located in Salt Lake City, Utah and provides clinical diagnostic laboratory services involving genomic services, DNA-based human identity testing, and related laboratory testing services. Previously, Lovelace sent biological samples to Affiliated Genetics, which Lovelace received illegitimately. Affiliated Genetics and/or associated laboratories in turn performed laboratory testing work on the biological samples and billed Medicare, among other health insurance carriers, for the clinical diagnostic laboratory services provided. From September 2013 through May 2014, Affiliated Genetics paid Lovelace approximately $555,191.

20. On or about November 14, 2013, Lovelace received an email communication from an Affiliated Genetics representative stating the following:

> "Brock, We had an interesting situation arise today. We received a sample from Dr. C████'s office on July 16, 2013. This sample is for a patient named [G.M.] The sample we received in July had a collection date of May 14, 2013. The first

> *sample failed and we asked for a recollection. We received a second sample from Dr. C\_\_\_\_'s office for this patient on October 2, 2013. This is where it gets sticky – We billed Medicare and they sent us a rejection letter stating, 'patient was deceased at date of service'. I tried twice to call [the doctor's] office and the number on their requisition form goes to a general voice mail box that is full and not accepting any more messages. Since I could not get a hold of the doctor's office I decided to google the patient. I did find his obituary stating he died on June 21, 2013. We are wondering how they could have recollected on this patient as he was deceased at the time of collection. Please advise."*

(Redactions added for this Affidavit.)

There was no reply found from Lovelace to this email.

21. On or about December 5, 2013, Lovelace received an email communication from the same Affiliated Genetics representative stating the following:

*"Can you update me on this?"*

There was no reply found from Lovelace to this email.

22. On or about December 31, 2013, Lovelace received an email communication yet again from the same Affiliated Genetics representative stating the following, in pertinent part:

*"Any Updates?"*

*"Patient Name...[G.M.]...Patient deceased at time of service"*

There was no reply found from Lovelace to this email.

23. When Lovelace was arrested on May 13, 2014, in the existing U.S. v. Lovelace, et al. case, he was in possession of Affiliated Genetics medical forms

containing patient information relating to drug testing for Medicare beneficiaries. He also had approximately $8,000 in cash in his BMW and had just returned from south Florida.

### F.   Recent Illegal Kickback Activity

24.   Lovelace has continued to engage in illegal kickback arrangements even after his release on bond in his pending federal criminal case. Specifically, Lovelace and DuBois have been meeting with CW1 in south Florida on a weekly to bi-weekly basis since at least late summer 2014 to deliver illegal cash kickback payments in return for completed DNA test samples. CW1 has taken the cash and delivered it to certain purported medical clinics in Miami-Dade County in return for the DNA test samples. CW1 has, in turn, delivered the DNA test samples to Lovelace and DuBois for their use in causing laboratories to submit reimbursement claims for clinical diagnostic laboratory services provided in connection with the samples.

25.   On October 29, 2014, Lovelace, DuBois, and CW1 met at a coffee shop in Miami, Florida for the purposes of Lovelace and DuBois providing cash to CW1 for kickback payments and receiving DNA test samples from CW1 procured as a result of cash kickback payments.

26.   At approximately 3:50 p.m. on October 29, 2014, CW1 arrived at a coffee shop located on SW 142nd Avenue in Miami in a vehicle registered in the state of Florida to CW1. CW1 exited CW1's vehicle and entered the coffee shop. At approximately 4:03 p.m., Lovelace arrived at the coffee shop in a black BMW 535i, Florida license plate BIV-S94. The BMW is registered in the state of Florida to David Brock Lovelace. The vehicle is the same BMW that had been seized pursuant to a Seizure Warrant and

subsequently returned to Lovelace pursuant to a limited release agreement. Lovelace exited the BMW and went inside the coffee shop. Once inside the coffee shop, Lovelace greeted CW1 with a kiss and they sat down together. CW1 was overheard telling Lovelace that a woman was coming.

27. Approximately 14 minutes later, CW1 and Lovelace exited the coffee shop together, and they sat in the front seat of CW1's vehicle. Lovelace then exited the front seat of the vehicle, opened the back door of the vehicle, retrieved a box, and then sat back down in the front seat of CW1's vehicle. Approximately five minutes later, Lovelace and CW1 exited CW1's vehicle and went back inside the coffee shop. At approximately 4:30 p.m., CW1 exited the coffee shop, went to CW1's vehicle, and was on the telephone. Afterward, CW1 returned inside the coffee shop and sat back down with Lovelace. At approximately 5:10 p.m., Lovelace exited the coffee shop, went to his BMW, retrieved a computer and a folio from his BMW, and went back inside the coffee shop where he reviewed a spreadsheet on his Dell laptop computer.

28. Shortly afterward, a white Toyota Highlander, Florida license plate APR-G37, registered to DuBois, arrived at the coffee shop. Lovelace exited the coffee shop, spoke to DuBois through the window of DuBois' Highlander, and then returned inside the coffee shop. CW1 exited the coffee shop.

29. CW1 went to the Highlander and spoke with DuBois while DuBois opened the rear hatch of the Highlander. DuBois then went to the front part of the Highlander and returned to the rear of the Highlander with an envelope from SunTrust Bank and a check. DuBois handed the SunTrust Bank envelope to CW1 along with the check. CW1 got in CW1's vehicle and left.

30. Lovelace then exited the coffee shop and spoke with DuBois outside the coffee shop. Lovelace and DuBois then reentered the coffee shop and sat down together where they were overheard discussing a "half-million dollar deal."

31. Approximately five minutes after CW1 departed the coffee shop in CW1's vehicle, CW1 was stopped by law enforcement. After CW1 was stopped, agents approached CW1, identified themselves, and asked CW1 if CW1 would speak with them, and CW1 agreed. CW1 drove CW1's vehicle, accompanied by an agent, to a cul-de-sac location on a nearby residential street where CW1 exited CW1's vehicle and met with agents in a different vehicle.

32. CW1 admitted that CW1 received cash from Lovelace and DuBois to pay illegal kickbacks to certain medical clinics in exchange for DNA test samples, and that CW1 had been doing this with Lovelace and DuBois for at least two months. CW1 said CW1 visits medical practices and doctors on their behalf and opens accounts with clinics. Once the accounts are established, CW1 said CW1 picks up DNA test samples approximately every week. CW1 gives the DNA test samples to Lovelace, and he and/or DuBois give CW1 cash to pay kickbacks to the clinics.

33. On this day, October 29, 2014, CW1 stated that CW1 gave Lovelace 58 test samples from four clinics, as follows: 31 samples from Double R Therapy; 8 samples from Excellence Medical Group; 17 samples from ACCPS LLC (a/k/a Amercian Consultants/Clinical Pharmacy Services); and 2 samples from Universal Medical and Therapy Group. None of these four clinics has an active Medicare provider number, which means none of these clinics would themselves be able to submit reimbursement claims to Medicare. DuBois gave CW1 $4,600 in cash, all in hundreds, inside the

SunTrust Bank envelope. DuBois also gave CW1 a check in the amount of $1,200 from a SunTrust Bank account in the name of Healthcare Marketing Florida, LLC.

34. Healthcare Marketing Florida is a limited liability company located at DuBois' residence in Melbourne, Brevard County, Florida that DuBois registered with the State of Florida on or about July 3, 2014. DuBois is the sole managing member and registered agent of Healthcare Marketing Florida.

35. CW1 explained that each one of the clinics receives approximately a $70 cash bribe per test sample except for ACCPS which receives approximately $100 cash bribe per test sample. CW1 makes the payments, and CW1 keeps any excess cash. Lovelace and/or DuBois provide the cash to CW1 for CW1 to then give to the principals of the clinics as "gifts" which CW1 admitted is not legal.

36. CW1 said CW1 has met with Lovelace and/or DuBois approximately ten times. DuBois came the previous four times by herself to pay CW1, Lovelace personally paid CW1 approximately two or three times, and Lovelace and DuBois came together on the above-referenced transaction date, October 29, 2014.

37. CW1 stated that CW1 receives $1,200 weekly as "salary" from Lovelace and DuBois. The most recent payment was a $1,200 check from Healthcare Marketing Florida.

38. CW1 stated that CW1 typically receives between $4,000 and $5,000 in cash from Lovelace and DuBois to use for the kickback payments or "gifts" to the clinics. CW1 explained that early in the arrangement, Lovelace had made two deposits of approximately $5,000 to $6,000 each into CW1's bank account. DuBois did the same.

CW1 told them not to do that any longer because CW1 did not want the deposits to be considered as part of CW1's business income.

39. On October 30, 2014, CW1 delivered the cash CW1 had received from Lovelace and DuBois to each of the four clinics. The exchanges were recorded via audio and video.

### G. Recent Structuring by Lovelace

40. On or about July 2, 2014, Lovelace opened a bank account at a SunTrust Bank branch in Lutz, Hillsborough County, Florida, account number ending 6727, in the name of DBL Management LLC. Lovelace is the sole managing member and registered agent of DBL Management, the address for which is Lovelace's residence in Land O' Lakes, Pasco County, Florida.

41. The same day Lovelace opened the account ending 6727, he deposited a check for $120,000 from Affiliated Genetics into the account. Within three weeks, Lovelace withdrew all of these funds, mostly in structured cash withdrawals under the amount that would otherwise trigger a bank reporting requirement. From approximately July 3, 2014 through July 23, 2014, Lovelace made 16 over-the-counter cash withdrawals totaling $109,323.54 from this account. All of these cash withdrawals were below $10,000—they were between $2,000 and $9,000 each—and occurred at multiple branch locations on the same and/or consecutive dates. Lovelace also made four ATM cash withdrawals totaling $3,200; one transfer of $4,911.74 to another SunTrust Bank account in the name of DBL Management; and 16 debit card purchases totaling $2,564.72.

H.  Conclusion

42.  WHEREFORE, based on the above information, I believe that probable causes exists that DAVID BROCK LOVELACE and DALE DUBOIS and did knowingly and willfully combine, conspire, confederate, and agree with each other and with others to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(2) by knowingly and willfully paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare, in violation of Title 18, United States Code, Section 371.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Isaac Bledsoe, Special Agent
U.S. Department of Health and Human Services, Office of Inspector General


Sworn and subscribed to before me this __10__ day of November 2014.

Honorable Thomas B. McCoun III
United States Magistrate Judge